Case number 15-3419, Andrew Njuguna Chege v. Loretta Lynch, or arguments not to exceed 15 minutes per side, Mr. Summers for the petitioners. Good morning, Mr. Summers. Good morning, Chief Judge. Do you wish to reserve time for rebuttal? A few minutes, please, judges. Okay. You may proceed. Thank you very much. May it please the court, my name is Blake Summers. I represent the petitioners in this case, the Chugga family. We're here today on the Chugga family's petition for review of a decision of the Board of Immigration Appeals, which adopted and affirmed the decision of the immigration judge, which denied the Chuggas requested relief under the Convention Against Torture. The judge looks like me. Oh, that's okay. Go ahead. Thank you. These issues have been pretty well briefed by the parties. With the permission of the court, we'd like to focus today on three issues that probably lend themselves a little better to oral argument. We only have before us the Convention Against Torture. That is correct, Judge. On review, the Chuggas affirmatively demonstrated that they were abandoning their claims for asylum, and they were abandoning their claims for withholding under the Immigration and Nationality Act. The only thing that is before this court is their claims under the Convention Against Torture. And they abandoned the others because of a timing problem. There is a timing problem, and candidly, there is a problem with the on-account-of portion of the statute demonstrating that the Chuggas might be persecuted on account of a protected ground. What they are suffering is going to be physical mistreatment that rises to the level of torture, but it's not necessarily going to be on account of a particular reason. So we focused instead simply on the torture convention grounds, Judge. So you've got these prior incidents, 1987 I think, again in 1996, where perhaps Munchiki attempted to break into the Chuggas' house, and then some essentially civil unrest. You know, you put all that together, it seems not to—questions as to how that rises to the level of more likely than not that the Chuggas would be tortured upon return to Kenya. It's a fine question. Isolated events, unclear in many cases what the reason for the attacks were. So I'd like to hear your best argument in favor of the standard being met. I appreciate the opportunity, Judge. A lot of this comes from the testimony that we received from the Chuggas' expert, Dr. Robert Blount, whose name I say blunt and blount, but I apologize for that. But what we have in this case is expert testimony that demonstrates that over a period of time, the Chuggas were subjected to various incidents, and the court has already brought those out. You've got 1987, 1996, and 2002, the massacre in the Chuggas' village that causes them to eventually flee Kenya. The Chuggas' expert at trial, his testimony, over 70 pages or around 70 pages, give or take, is that if the Chugga family is returned to Kenya, it is absolutely, that was his word, more likely than not, that they could face what the expert described as ethno-nationalist violence, which is not a word that I had heard prior to taking on this appeal, but that they could suffer from either ethno-nationalist violence or FGM. Now the F and FGM being female genital mutilation, and that obviously relates only to Sharon and Miriam Chugga. Those two petitioners very clearly have a concern that rises to the level of convention against torture. Let me ask you this. The record seems to suggest that a lot of the violence perpetrated by this group, this Munjiki group, some of it had state sponsorship, but a lot of it was just this somewhat independent group that wanted to return Kenya to more traditional values and didn't like a lot of the more modern stuff, I guess. And so what support is there that there's really a state sponsorship, a state coercion, that the government has somehow been behind this? That's a great question. That probably hones us in on the most difficult portion of Chugga's case, which is the connection between the Munjiki and the Kenyan state. What is demonstrated by the record, both in terms of the historical evidence presented from the corroborating materials and from the direct evidence from the Chugga's expert, is that at least the modern Munjiki share a somewhat veiled but very present relationship with the state. You see that in the wake of the 2002 election, where the Kenyan state is kind of directly sponsoring Munjiki activity. And then that's not successful, and so they start attacking Munjiki. But then another election comes around, and now the Kenyan state is sponsoring groups of Munjiki warriors, or whatever they were calling them, to go out and try to either do battle with people who are not supporting the current government or not supporting the current political party, or otherwise are being sponsored by the state. So what the Chugga's expert, I think, appropriately describes is this on-again, off-again relationship with the state. But at least over the past two election cycles, although there may, if I'm doing the math right, there may have been one more recently in 2014, but over at least the two that we have as record evidence, we do have state sponsorship of Munjiki action. I think that's where you see the relationship between the Kenyan state and the Munjiki. Now, part of the problem is that the agency, for whatever reason, basically ignores the expert. There are 70 pages of expert testimony. When you get to the immigration judge's decision, it's about 23 pages long. Granted, the immigration judge does take a look at what the expert said when he's doing, well, here's what the facts are, here's what we heard. But then we get to the analysis portion, and the expert testimony vanishes. The same thing happens at the Board of Immigration Appeals. They adopt and affirm the immigration judge's decision, but they never bring up 70 pages of expert testimony. Now, 70 pages of testimony ignored by an agency would be concerning in any event, but it is most certainly concerning when it is a testimony of an expert who is offering an opinion that, at least in terms of the expert's qualifications, has been stipulated to by the Department of Homeland Security and is then ignored by the agency. And that's a significant problem. And it's not a case where we could say, oh, there's no prejudice. It's not a case where we could say this is harmless error. The expert for the chagas is testifying directly as to the standard of proof that the chagas need to meet. That's more likely than not. That's what his testimony is giving. It's not hilarious that he just can't figure out from the circumstances what the relationship is between the state and this group because it's so amorphous that it's difficult to describe, I guess. Could I ask you this? Sharon is a 17-year-old girl, and she's lived here for a long time now. That's correct. And does DACA apply here? That is, and if not, why not? I don't believe it's reflected by the record, but I do believe that at least in terms of my own knowledge, I do believe Sharon does have DACA, but her parents do not. Obviously they don't because there's no DACA for adults. If she's eligible, has she sought deferred action? She has, and I believe it has been granted for Sharon alone. But the other members of her family, because of her age, cannot participate in the DACA. If she were a little baby, maybe they could stay, right? But I don't know what the rules are there now. They seem to be kind of amorphous. As far as the DACA program, there's no real derivative DACA for parents of children who are able to receive it. There are some programs currently on review at the Supreme Court which might assist the chagas, not necessarily, though, because they don't have a United States citizen child. It seems like she's been granted DACA, but the others are not eligible. They can't figure out an argument for DACA. That is correct. I don't believe that. I think they're too old, to be honest. I think you have to be 31 or under as of 2006 or 2007, and by 2002, Andrew was 32 or 33. So they're well aged out of the DACA program, even though they qualify educationally. I wanted to ask you about, you made reference to, I guess it's Dr. Blunt. I've got his 70-something pages of telephonic testimony in his declaration. Can you point me to where I could find that there is sufficient support, I guess the standard is more likely than not, that Miriam or Sharon would be subject to mutilation? Judge, I thought you might ask that. What I have it as is it's Certified Administrative Record, page 574. I will grant that I'm not exactly positive what page that is in the transcript itself, but that's what I have is the Certified Administrative Record. That's what's cited as support in terms of the brief, and it is where he responds to a question from counsel. And let's be clear, because I want to make sure I'm not misstating anything Dr. Blunt did, and he's pretty clear about it too. These threats are in an election year only. So that cyclical violence that we see really mirrors that Kenyan election cycle, and Dr. Blunt is very clear, he's very candid with the court, that in a non-election year, the Chagas are probably not at risk. But in an election year, his testimony is that they absolutely are. And when you take a look at the risk, for FGM, clearly that rises to the level of torture. Whether it's illegal, whether it's only been practiced on 30% of the population makes 0% difference. FGM is torture. There's no way around that. That's pretty clear. There are a lot of tribes. Are the Misa, are they in Kenya too? That I am not sure. You know the big, tall runners who always win the races and so on? Sure. Yes, Judge. They're Kenyans, aren't they? I believe that's correct. I don't know that much about Kenyan tribal affiliations, but that sounds correct, Judge. As far as the practice of FGM, though, it's pretty much universally held, whether from an administrative, a human rights, or a court of appeals opinion, that the practice of FGM constitutes torture. When you're doing that to a child, when you're doing that to a woman, that's not permissible. It's illegal in the United States. It's illegal in Kenya. It should be illegal everywhere, even though it may not be. How do we determine the threshold for when it's more likely than not? If it occurs to 5% of the population, 10%, 15%? Is there sort of a threshold percentage? Is that how we should look at it? I was hoping you would ask that. No, there is not, because the law does not require – respectfully, no – the law does not require that a certain percentage of people be persecuted prior to a time when other people can seek relief. And that's a problem that we get when the court looks at this expert's testimony. They don't analyze it in the decision, but there's some cross-examination by the Department of Homeland Security where they posit this idea that perhaps it's not more likely than not because 51% – perhaps torture is not more likely than not – because 51% of the nation of Kenya has not been tortured yet. But that's absolutely not the standard. It depends on what location you're in in Kenya, right? That's absolutely correct. I thought the law was that when you're going to be sent back to some place, if there are significant parts of the country that are not subject to the problem, then you can't claim asylum and so on. And it looks like to me there are lots of parts of Kenya that are not subject either to genital mutilation or other kinds of warrior terror, right? You are correct, Judge. That is the standard that is typically used, and if somebody can successfully internally relocate, they cannot claim humanitarian protection. But the record evidence in this case demonstrates that they cannot, and that's received directly from Dr. Blunt, who opines that the family could not be safe even if they were to leave their locality of the Rift Valley. This is where we get into the situation. If you needed to take a law student, if you needed to take a young attorney – I'm still a young attorney – a younger attorney than me, and say this is a primer on how to prove up an asylum claim. That's this case. You have credible testimony, and we know how rare it is to have credible testimony. Usually the first hill we have to climb is an adverse credibility determination. That credible testimony is backed up by corroborating evidence not only from the human rights reports from the Department of State, but also independent places. All of that is backed up by expert testimony, which specifically addresses the standards but is ignored by the agency. The substantial evidence in this case compels a contrary result, and we'd ask that the decision below be reversed. I see my time has expired. If the panel has any questions, I'd be happy to answer them. Apparently not right now, so thank you very much. You'll have your rebuttal time. Thank you, judges. Mr. Norwood. Good morning, Your Honor. Anthony Norwood for the respondent. Your Honors, this is not an asylum case. This is a torture case, and the evidence in this record does not compel the conclusion that either of the female petitioners will be tortured. When you spoke of state support, the Munginki have been outlawed, FGM has been outlawed, and the record at one point says that the Munginki have been crushed. FGM is not favored by this family. It's opposed by Christians in Kenya. It's opposed by this tribe. The tribe is like 80 percent of the population. The petitioners are Christians. Nobody in their family has experienced FGM. The mother said she'd never known anybody to experience FGM. Everybody is opposed to FGM. The Munginki have been crushed, and I certainly don't have any idea about that from the record. But I thought I saw in a couple of places in the record that there still might be as many as a million Munginki around. I don't know how organized or active they are, but I didn't get the impression that they are completely crushed and not. I agree. At one point the record says they were crushed. I agree that it's confusing whether they're actually crushed. Dr. Blunt would say that they arise and come back at every election year. So I wouldn't say that they're crushed, but they are illegal. FGM is illegal. So our argument is, and it's clear, that there would be no state support for torture in this case.  The immigration judge made a very scant reference to the extended declaration and testimony of Dr. Blunt and the BIA, I think no reference to Dr. Blunt. The evidence upon which these petitions rely  Mr. Summers cited a spot in the record that he says supports the FGM. I was wondering how your response, because there is very little mention of Dr. Blunt in the immigration judge's ruling. There is very little mention of Dr. Blunt in the agency decisions. My leading argument is there's very little argument from petitioner that Dr. Blunt supports their claim, Dr. Blunt. His declaration and his testimony is very broad. It's, I shouldn't say confusing, but it was... On the one hand this, on the other hand that. Yes, it is. And it's academic speak that is unusual to me. But his main point was the risk of ethno-nationalist violence that the Cheggys in an election year would face an increased risk of ethno-nationalist violence. Well, ethno-nationalist violence is not torture. It's not part of the torture claim. To reach the torture claim you've got to extend to risk of FGM. You've got in this record from this court's review the evidence must compel the conclusion that the female petitioners face the risk of FGM. Is the policy now that you are administering on DACA, she's eligible for DACA, is she? Sharon? The policy is that we know, that my office knows very little about it. There is no policy. The policy that we know about is in the Supreme Court right now. DACA is an issue between the petitioners, the family in this case, and DHS. It's news to me that Sharon has DACA. I didn't know that. It's not in this record. It was not presented. It depends on who gets elected president next time. Well, it depends maybe who gets appointed to the Supreme Court. I don't know. But it's not part of this record. It's not something that we did approach. I did approach the DHS about prosecutorial discretion for this family under the memoranda that are before the Supreme Court right now. And so it's still up in the air. But the DHS refused prosecutorial discretion because of the date of the BIA's decision in this case, which is just last year in 2015. They were exercising prosecutorial discretion for cases before 2014. Prosecutorial discretion, that was kind of out the door for the time being. Yes, it is. Your Honor, our point is that this record does not compel the conclusion that the petitioners will face torture. FGM is illegal in Kenya. The Mujiki are illegal in Kenya. That doesn't show any state support. And the likelihood that these ladies will face it is low. It's illegal. It's opposed by Christians. It's opposed in her family. She's never met anyone who ever experienced it. It's not established in this record. Are there no more questions? Apparently not. Thank you. Thank you. Thanks, Mr. Norwood. Mr. Summers. Thank you, judges. I will be extremely brief. Simply as to the point that ethno-nationalist violence is not torture. That was raised by Mr. Norwood. I think that's a valid point to address. What we have in the Cheggas case, though, is that the ethno-nationalist violence that we're talking about is extreme. We're talking about a group who uses beheadings, dismemberment, and forced female genital mutilation in order to forcibly intimidate a populace and cause fear so that people will comply with what they want. There is specific reference, and I should have brought my other notebook, in the record that demonstrates where one of the Mujiki leaders says, we do this on purpose, we do this to instill fear, and we do this so that people will obey us because if you don't listen to us, you're next. And that is what we're talking about when we're talking. What is it, though, when the chances of it happening are one in 50 or 100 or 1,000? You know, I mean, it's only if the risk of it is extremely high, right? Yes, Judge. The risk needs to be 51% or greater, and that's what the expert testifies to, and that's what the agency ignores, and that's the problem that we have today, is the support for the risk that the chagas would face, which is testified to by somebody stipulated and accepted as an expert by the agency is then ignored by the agency. It's not harmless, and it should be taken into account. If the court has anything else, I'd be happy to answer. If not, thank you very much, both of you, counsel, for your arguments today. The case will be submitted, and you may call the next case. Thank you, judges.